UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARIA HUERTA,

               Plaintiff,

     v.

MICHAEL J. ASTRUE,

               Defendant.

Case No.  13-cv-01210-WHO

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 16

     Plaintiff Maria Huerta appealed the Commissioner of Social Security's partial denial of disability benefits, and both Huerta and the Commissioner have moved for summary judgment. Pl.'s Mot. (Dkt. No. 15); Def.'s Mot. (Dkt. No. 16).  The Administrative Law Judge determined that Huerta, who has a history of Hodgkin's lymphoma, neuropathy, lumbar stenosis, and tenosynovitis, was disabled and entitled to benefits from March 21, 2008 through May 31, 2009. But she also determined that a medical improvement related to Huerta's ability to work occurred, and concluded that Huerta was not disabled as of June 1, 2009.

     In making the latter determination, the ALJ rejected or discounted the overwhelming weight of the evidence: the opinions of several treating and examining physicians who concluded that Huerta was disabled or significantly limited in her functioning, the favorable testimony of the medical expert, and the testimony of Huerta and other lay witnesses.  The ALJ instead relied solely on the unfavorable testimony of the medical expert and the non-examining medical consultant.  After carefully examining the parties' arguments, the record, and the ALJ's decision, I find that the ALJ committed legal errors that warrant remand.

**BACKGROUND**

**I.  PROCEDURAL HISTORY**

     On April 23, 2009, Huerta filed an application for a period of disability and disability

United States District Court
Northern District of California

insurance benefits, alleging disability beginning March 21, 2008.  AR 107.  Her application was denied initially and again on reconsideration.  AR 134-140.  She requested a hearing and appeared before the ALJ on June 30, 2011.  AR 19-88.[1]  On November 22, 2011, the ALJ granted Huerta's claim for benefits from March 21, 2008 to May 31, 2009 but denied her claim for benefits as of June 1, 2009.  AR 107-127.  On January 18, 2013, the Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.  AR 1-6.

## II.  MEDICAL HISTORY

Huerta was diagnosed with Hodgkin's lymphoma in February 2008, and underwent chemotherapy from March 2008 to August 2008.  AR 372, 463.  Although Huerta's chemotherapy treatment was successful with respect to her Hodgkin's lymphoma, she suffers from several related and unrelated impairments and has been treated or examined by several doctors whose treatment notes, clinical findings, and opinions are discussed below.

In March 2009, Huerta visited Dr. Michael Wu, an oncologist, for fatigue.  AR 462-63.  Dr. Wu indicated that Huerta's fatigue was probably caused by sequale from her chemotherapy treatment, and would likely improve in the coming months.  AR 463.  However, Dr. Wu later acknowledged that Huerta suffered from neuropathy likely caused by her chemotherapy treatment.  AR 491.

Dr. Martha Sandoval, Huerta's primary care physician, indicated that she has seen Huerta two or three times per year since 2007.  AR 57.  Huerta visited Dr. Sandoval in March 2009, and complained of right wrist pain, shoulder, and hip pain.  AR 453-54. Dr. Sandoval's diagnostic impression was that Huerta had tenosynovitis in her right wrist and bilateral shoulder and hip pain, and referred Huerta to occupational hand therapy and splinting for her wrist.  AR 454.  Dr. Sandoval also noted that Huerta has symptoms of peripheral neuropathy and weakness in her lower extremities.  AR 454.

Huerta then visited Dr. Alfred Petrocelli, a rheumatologist, in March and April 2009.  AR 445.  Dr. Petrocelli provided splinting for Huerta's wrist in March.  In April he noted that Huerta's

---

[1] An additional hearing occurred on June 8, 2011, but was continued so that the medical expert could review additional medical records submitted by Huerta's attorney.  *See* AR 89-100.

tenosynovitis had not improved, but that Huerta was wearing her splint incorrectly and had not yet pursued occupational hand therapy. *Id.* Dr. Petrocelli, like Dr. Sandoval, indicated that Huerta had symptoms of peripheral neuropathy and weakness in her lower extremities. AR 445, 454. Dr. Petrocelli also administered an MRI, which indicated that Huerta had mild spinal stenosis. AR 445. However, Dr. Petrocelli noted that Huerta's station and gait were within normal limits, and the straight leg raising sign and femoral nerve stretch test were negative bilaterally. AR 446. He referred Huerta to neurology, and ordered epidural corticosteroid injections for back and lower extremity pain, and an MRI of Huerta's hip. AR 445.

In April 2009, Huerta visited Dr. Allan Dorosin, a neurologist, for pain and numbness in her feet and legs. AR 441. Huerta also reported symptoms of nausea and vertigo. AR 442. Dr. Dorosin noted that Huerta's ankle reflexes were absent, and that she reported sensory loss. *Id.* He diagnosed Huerta with sensory neuropathy caused by her chemotherapy, ordered nerve conduction studies to quantify Huerta's peripheral neuropathy, provided her with a letter indicating disability from painful peripheral neuropathy, and prescription for gabapentrin, a pain medication. AR 443.

In May 2009, Dr. Josh Novic administered nerve conduction studies, and diagnosed Huerta with left sural mononeuropathy. AR 490. Huerta also saw her oncologist Dr. Wu in May 2009, who noted that she had "increasing neurologic findings for which she was seen" by Drs. Petrocelli, Dorosin and Novic, for which "she is currently undergoing further evaluation" and on "Neurontin therapy" for her feet neuropathy. Dr. Wu indicated that the "overall consensus is that most likely the neuropathy is related to her chemotherapy." AR 491. With respect to her lymphoma, Dr. Wu noted that "the blood work [] showed no evidence of any recurrent disease. She is overall feeling much better. She overall is smiling much more and has no other active complaints. She does feel that she is getting better." *Id*.

Huerta visited Dr. Paul Ware, a physiatrist, in May 2009. AR 539. Huerta complained of back pain, burning and tingling in her calves and feet, and was very stiff and sore. *Id.* Dr. Ware's physical examination indicated that straight leg raise was very positive bilaterally for bilateral calf and back pain, but that femoral stretch was negative, that Huerta had diminished sensation in her lower extremities, and that her ankle reflexes were absent. AR 540. Dr. Ware noted that

United States District Court
Northern District of California

polyarthralgia (pain in two or more joints) could be the cause of Huerta's foot and ankle pain, and impaired gait. AR 539-40. He diagnosed Huerta with general muscle deconditioning and a central disk annular tear with minimal central canal stenosis with no foraminal stenosis, which he speculated could also contribute to the pain in Huerta's calves and feet. AR 540. Dr. Ware also noted that Huerta had visited physical therapy once or twice, but felt that it was not professional and never returned. AR 539. Huerta later stated that physical therapy actually worsened her pain. *See* AR 652. He recommended that Huerta begin aquatic-based treatments and get epidural steroid injections, and Huerta underwent an injection later that month. AR 540, 799.

Huerta filled out a function report in May 2009. AR 277. She stated that she often engaged in light exercise, drove to local places such as the grocery store, talked on the phone and socialized daily, did not need reminders to take her medications, had no problem getting along with other people, including authority figures, and that she could walk about "1/2-1 short block" before needing to rest. AR 277-283. Huerta also indicated that she could pay attention fairly well, but that attention to detail was more difficult. AR 282.

Huerta's family members also filled out function reports in May 2009. Her sister indicated that she was fairly inactive because of pain in her legs, wrist, and other joints, and Huerta's husband stated that he often had to remind her to take her medication. AR 289-91. They also reported that Huerta was less active and less social. *See* AR 291-324.

In June 2009, Dr. J. Hartman—a non-examining medical consultant—assessed Huerta's residual functional capacity ("RFC"). AR 595-599.[2] Dr. Hartman opined that Huerta was limited in her lower extremities because of neuropathy that affected her feet and caused bilateral foot pain, and that her bilateral shoulder pain and tenosynovitis of the right wrist meant that Huerta could reach in all directions and handle occasionally. AR 596-97. Huerta's vertigo and nausea meant that she should avoid hazards. AR 596. Dr. Hartman opined that Huerta would occasionally be

---

[2] In response to the question whether there were "treating or examining source statement(s) regarding [Huerta's] physical capacities in file," Dr. Hartman checked "No." AR 599. However, this response could also mean that the medical sources "did not provide a statement regarding the claimant's physical capacities." *See id.* The record shows that Dr. Hartman reviewed a report from Dr. Dorosin dated May 19, 2009, as well as several other clinical and consultative reports from the period of February 2008 to May 2009. *See* AR 600-01.

United States District Court
Northern District of California

1    able to lift or carry 20 pounds, could frequently lift or carry ten pounds, could stand or walk with

2    normal breaks for a total of six hours in an eight-hour workday, could sit for a total of six hours in

3    an eight-hour workday, and could climb, balance, stoop, kneel, couch, and crawl occasionally.

4    AR 596-99.

5        A September 2009 MRI of Huerta's lower extremities revealed no significant

6    abnormalities.  AR 760.  Around this time, Huerta's doctors agreed that she had mild to moderate

7    spinal stenosis.  AR 879.  Dr. Petrocelli opined that Huerta's tenosynovitis had improved, and that

8    she still had neuropathy and bilateral hip pain.  AR 880.  He recommended an MRI of Huerta's

9    hips after ruling out occult osteonecrosis as a cause of Huerta's hip pain.  *Id.*  Later that month, Dr.

10   Petrocelli's physical examination indicated that Huerta's station and gait were within normal

11   limits, straight leg raising sign and femoral nerve stretch tests were negative bilaterally, and that

12   Huerta's shoulder and wrists appeared normal.  *Id.*  Dr. Petrocelli again referred Huerta to

13   occupational hand therapy and scheduled a corticosteroid injection for her tenosynovitis.  AR 890.

14       Also in September 2009, Dr. Dorosin noted that Huerta had a great deal of difficulty

15   walking because of pain in her feet, that her reflexes were reduced, and that she had some

16   "subjective sensory loss."  AR 882.  Dr. Dorosin noted that Huerta had previously undergone

17   some additional testing to determine the cause of her neuropathy, but concluded that "the most

18   likely explanation for her painful peripheral neuropathy is her previous treatment with

19   chemotherapy" because he did "not have any alternative explanation for her complaints."  *Id.*  He

20   also filled out a Department of Motor Vehicles parking placard that indicated disability because of

21   painful peripheral neuropathy.  *Id.*

22       In March 2010,[3] Huerta saw Dr. Dorosin for her neuropathic symptoms, and requested

23   pain medication.  AR 732.  Dr. Dorosin noted that Huerta's reflexes were reduced and that she

24   appeared to walk stiffly.  AR 733.  Dr. Dorosin observed that Huerta's physical signs of sensory

25   loss and ataxia (inability to coordinate movements) seemed "disproportionate to the problem," but

26   indicated that Huerta will have additional testing looking for "alternate explanations for her

27

28   [3] The record does not appear to contain any medical treatment notes or evidence from the period
     of October 2009 to February 2010.

5

1   peripheral neuropathy." AR 732-33. He then ordered a brain scan given Huerta's memory

2   problems and ataxia, and nerve conduction studies. AR 733.

3           Huerta also complained of memory loss to Dr. Dorosin in March 2010, and a mental status

4   examination showed some impaired memory function. AR 732-33. Huerta reported that she was

5   taking four hours of college courses and that her medication was interfering with her studies, but

6   Dr. Dorosin replied that he had no pain medication that would not alter memory. AR 733.

7           Dr. Novic administered further nerve conduction studies in April 2010. AR 798. He noted

8   that Huerta had normal nerve conduction in her left foot, an improvement from her prior tests in

9   May 2009, and that her "sural sensory" had also improved. *Id.*; *see also* AR 912 (explaining in

10  more depth results of April 2010 tests).

11          Later that month, Dr. Dorosin explained that Dr. Novic's nerve conduction studies showed

12  some improvement, and remarked that Huerta's "physical examination is more abnormal than her

13  nerve conduction studies," that Huerta was "dramatically ataxic," and had a "profound subjective"

14  loss for pin, touch, and vibration sense in her lower extremities, but "that does not necessarily

15  mean that the patient's impairment is embellished." AR 722-23.

16          Dr. Dorosin noted that additional testing ruled out hypothyroidism, B12 malabsorption,

17  and vasculitis as the cause of Huerta's symptoms. AR 722. He also noted that Huerta had

18  postponed a brain scan because she believed her memory issues were caused by her medications,

19  but had also declined Dr. Dorosin's offer to try a new medication for fear that the medication

20  would interfere with her cognition and ability to return to work. AR 723. Dr. Dorosin agreed with

21  Huerta's observation that the pain medication he prescribed "probably interfered with memory and

22  her cognitive functioning." *Id.*

23          Dr. Hideki Garren, an orthopedist, examined Huerta in April 2010 and assessed her

24  exertional limitations. AR 652. Dr. Garren's musculoskeletal diagnosis and impression was that

25  Huerta had chronic low back pain caused by spinal stenosis, and bilateral lower extremity

26  peripheral neuropathy. AR 652-53. She opined that Huerta could occasionally lift ten pounds, sit,

27  stand, and walk for one hour at a time for each activity for four hours per day for each activity,

28  occasionally reach, operate foot controls, climb stairs and ramps, kneel, crouch, crawl,

United States District Court
Northern District of California

6

occasionally be exposed to unprotected heights, moving mechanical parts, and operate a motor vehicle, but could never walk on uneven surfaces.  AR 654-59.  Dr. Garren also noted that Huerta did not need a cane to ambulate.  AR 655.

Huerta visited Dr. Sandoval in September 2010 with complaints of depression, back pain that radiated to her legs, tinnitus (ringing in the ears), dizziness, and chronic nausea.  AR 711. Huerta indicated that she wanted to try sleep medication and then return in a month to discuss depression.  *Id.*

In an RFC assessment dated October 12, 2010, Dr. Wu indicated that the prognosis of Huerta's Hodgkin's lymphoma was "good."  He did not answer questions about Huerta's symptoms, pain, clinical findings or objective signs, or limitations in a competitive work environment, perhaps because his role in Huerta's treatment was limited to her Hodgkin's lymphoma, rather than her other impairments.  AR 661.  But he did opine that Huerta was not a malingerer, that her impairments were reasonably consistent with her symptoms, and that her impairments could reasonably be expected to last for 12 months.  AR 660-65.  Dr. Wu also noted that Huerta had problems with pain, neuropathy, and standing after her chemotherapy, and offered to provide Huerta's records from neurology.  *Id.*  In his treatment notes from October 2010, Dr. Wu stated that Huerta's Hodgkin's lymphoma was in remission, but that she suffered from peripheral neuropathy.  AR 697.  He also noted that Huerta's symptoms began after her chemotherapy treatment.  AR 697-98

In an RFC assessment dated November 13, 2010, Dr. Sandoval opined that Huerta's prognosis was "fair," and that her symptoms included chronic low back pain that radiates to both of her legs, poor concentration, tearfulness, dizziness, tinnitus, and nausea.  AR 667.  Dr. Sandoval indicated that Huerta was areflexic, had subjective loss to pin, touch, and vibration, and that her medications affected her concentration.  *Id.*  Dr. Sandoval opined that Huerta was not a malingerer, that her pain was constantly severe enough to interfere with her attention and concentration, that Huerta was incapable of low stress jobs, that her impairments were reasonably consistent with her symptoms, and that her impairments had lasted and could be expected to last for at least 12 months.  AR 666-71.  Dr. Sandoval also opined that Huerta could walk zero city

blocks without rest or severe pain, and needed a job that allowed her to shift positions and take unscheduled breaks.  AR 668-69.  She also opined that Huerta did not require a cane or other assistive device to walk "while engaging in occasional standing/walking," could occasionally lift less than ten pounds in a competitive work situation, could occasionally move her head in different directions, had no significant limitations with respect to reaching, handling, or fingering, but could never twist, stoop, crouch, squat, or climb.  AR 669-70.

In an RFC assessment dated November 30, 2010, Dr. Dorosin opined that Huerta's diagnosis was "chronic" peripheral neuropathy and spinal stenosis, and that her symptoms included severe pain and paresthesias in her feet and ankles and nausea.  AR 673, 676.  He indicated that Huerta's pain resulted in cognitive limitations and impaired concentration and attention, and also that her medications caused drowsiness.  AR 674.

Dr. Dorosin opined that Huerta was not a malingerer, that her pain was constantly severe enough to interfere with her attention and concentration, that Huerta was incapable of low stress jobs, that her impairments were reasonably consistent with her symptoms, that her impairments had lasted and could be expected to last for at least 12 months, and that Huerta would be absent from work more than four days per month.  AR 672-77.  Dr. Dorosin specifically wrote, "I don't think she can work" on the form.  AR 674.  He stated that Huerta could walk two city blocks without rest or severe pain, could sit and stand for 15 minutes at a time, could sit, stand, or walk for less than two hours in an eight-hour working day, and needed two ten-minute periods of walking around during an eight-hour working day.  *Id.*  He added that Huerta would need 12 unscheduled breaks per work day for 45 minutes at a time, could rarely lift less than ten pounds, could never twist, stoop, crouch, or squat, and had significant limitations with reaching, handling, or fingering.  AR 674-75.

In his treatment notes from November 30, 2010, Dr. Dorosin noted that Huerta was examined, that she had a wide-based gait, was dramatically unsteady in the Romberg position but could be distracted, was hyporeflexic, her reflexes at the ankles were "diminished," she "seemed" to have profound loss of sensation in her lower extremities, misidentified pain sense and cannot identify vibration sense or pin.  AR 684-85.  Dorosin and Huerta discussed alternate medications

8

to control her neuropathy pain, but Huerta was disinterested in those medications because of their cognitive side effects.  AR 685.  He also noted that Huerta's nerve conduction studies were "mildly disordered."  *Id.*  Dr. Dorosin also remarked that the "main purpose" of that visit was for him to fill out the RFC form, and that he "filled out the form specifically using [Huerta's] responses."  *Id.*

In his RFC dated February 11, 2011, Dr. Ware opined that, based on MRI and exam findings, Huerta had spinal stenosis, disc disease, and polyarthralgia that was chronic and unremitting, and that her symptoms included pain and numbness in the lower back, constant burning in the feet and calves, and that her medications caused drowsiness.  AR 899.  Dr. Ware found that Huerta was not a malingerer, that her pain was constantly severe enough to interfere with her attention and concentration, that Huerta was capable of low stress jobs, that her impairments were reasonably consistent with her symptoms, that her impairments had lasted and could be expected to last for at least 12 months, and that Huerta would be absent from work more than four days per month.  AR 899-903.  He stated that Huerta could sit for 15 minutes at a time, stand for five to ten minutes at a time, could sit, stand, and walk for less than two hours in an eight-hour workday, needed to be able to shift positions at will and walk around for two minutes at a time and take consistent 30 minute breaks throughout the workday.  AR 901.  He also opined that Huerta could rarely lift less than ten pounds or ten pounds, could never lift an amount greater than ten pounds, and that she needed a cane or other assistive device when engaged in occasional standing or walking.  *Id.*  He added that Huerta could rarely look down or up, could occasionally turn her head left or right or hold her head in a static position, could never twist, stoop, crouch, or climb ladders, could rarely climb stairs, and had significant reaching, handling, fingering, twisting, and finger manipulating limitations.  AR 902.

In May 2011, Huerta visited Dr. Sandoval for memory issues, and explained that she was forgetful, and made many mistakes around the house.  Dr. Sandoval attempted to administer a mini-mental status exam, but was unable to complete the exam because Huerta forgot her eyeglasses.  AR 906-07.  She then referred Huerta to a neurologist for a complete assessment of her memory issues.  AR 907.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Huerta visited Dr. Novic in June 2011, primarily for memory issues.  AR 911-12.  Huerta's

2    husband reported that she had memory problems, although Huerta believed that she only had

3    memory problems when she took her medication.  AR 911.  Dr. Novic noted that Huerta had

4    difficulty walking, diminished reflexes, and diminished sensation below the knees, that her gait

5    was antalgic, that she could not and would not attempt to walk on her heels, and that she had

6    diminished hearing bilaterally.  AR 913.  However, Dr. Novic also stated that his "general

7    impression" was that Huerta did "not give full effort on the examination."  *Id.*  He also noted that

8    there was no objective correlation between Huerta's symptoms and the results of the nerve

9    conduction studies, "although they would all be very difficult to confirm objectively this way."

10   *Id.* ("small fiber neuropathy can occur in the absence of electrodiagnostic abnormalities.

11   However, her findings would suggest a larger fiber involvement and this should correlate with

12   some abnormality on nerve conduction testing").

13   Because of Huerta's symptoms of memory disturbance, Dr. Novic administered a mini-

14   mental status exam.  AR 913.  Huerta scored 22/30, which indicated memory impairment.  *Id.*

15   However, Dr. Novic stated that he could not tell if Huerta was giving full effort to the questions,

16   and therefore it was "difficult to interpret her Mini Mental Status examination score in light of her

17   entire performance on the examination today, where there are clearly elements of elaboration."  *Id.*

18   Finally, Dr. Novic ordered a brain MRI and Lyrica instead of Gabapentin to see if that would help

19   with her pain in her feet without causing the cognitive side effects.  *Id.*  The June 2011 brain scan

20   revealed no abnormalities.  AR 934.

21   At the June 30, 2011 hearing before the ALJ, Dr. Huntley—a non-examining medical

22   expert—testified that although Huerta had neuropathy, her subjective complaints could not be

23   explained scientifically and that the medical treatment evidence failed to quantify Huerta's

24   functional capacity, and specifically noted that there was no evidence of a medically prescribed

25   cane or other assistive device.  AR 38-40.  Dr. Huntley testified that, in general, Huerta's pain was

26   associated with her peripheral neuropathy because there were no physical examination or clinical

27   notes discussing the effect of her other impairments.  AR 53.

28   Dr. Huntley also testified that the record confirmed that Huerta could walk for about 15

10

minutes at a time, and also opined that it was a "possibility" that Huerta could not sit for more than 30 minutes without getting up and moving around for about 15 minutes.  AR 43-44.  Dr. Huntley testified that Huerta has the type of neuropathy that is not going to get better, and that most patients with this type of neuropathy cannot sit for long periods of time.  AR 40.  Dr. Huntley also opined that once Huerta stood up and started walking around it was likely that the pain would go to her feet, and testified that Huerta should receive "the same restrictions [given] to epileptics, including no climbing on ladders . . . . stooping" and avoiding hazards.  AR 43, 55-56.  Dr. Huntley agreed with Dr. Dorosin's opinion that Huerta would need about 12 breaks per day.  AR 46.

Dr. Huntley testified that Huerta's back impairments and tendonitis were non-severe but that they could contribute to some of the paresthesis in Huerta's calves and feet.  AR 46, 49-51.  Dr. Huntley acknowledged that Huerta had complained of tinnitus, but noted that there was no record of attempted treatment of this issue.  AR 53-54.  Dr. Huntley stated that Huerta might be capable of a job that did not require her to move around constantly.  AR 55-56.

As for Huerta's mental status, Dr. Huntley expressed concern with inconsistency in elaboration of symptoms, and recommended psychometric testing to determine if Huerta had an "organic memory problem."  AR 36.  Dr. Huntley testified that "psychometrics . . . . will show if [Huerta had] true memory loss or [was] malingering."  AR 35.  With respect to Dr. Dorosin's opinion that Huerta had a cognitive limitation because of her pain, Dr. Huntley testified that Dr. Dorosin could not have quantified the effect of this issue because Dr. Dorosin "didn't do a mental status exam to show [Huerta] has a cognitive defect."  AR 45.

Dr. Sandoval also testified at the ALJ hearing.  She testified that Huerta suffered from lower back pain that radiated to her legs and affected her ability to walk, had difficulty with concentration and was forgetful, and that her opinion from the October 2010 RFC assessment had not changed.  AR 57-61.  She opined that Huerta suffered from depression, would need several unscheduled breaks throughout the course of an eight-hour workday, could lift less than five pounds, and could not twist, stoop, crouch or squat.  AR 60-61.  Dr. Sandoval also testified that prolonged sitting, walking, and standing were very difficult for Huerta.  AR 60. Dr. Sandoval

confirmed that Dr. Novic administered a mental status examination in June 2011, and that Huerta had scored a 22/30, which indicates a significant impairment with memory.  AR 58-59.  Dr. Sandoval noted that Huerta's medications contributed to her impairments, that Gabapentrin could be the cause of Huerta's nausea, and that Gabapentrin, Flexeril, Cyclobenzaprine, and Zolpidem could all cause sleepiness and impaired concentration.  AR 60-61.  Finally, Dr. Sandoval testified that she believed that the symptoms discussed in her October 2010 RFC assessment are real.  AR 61.

Huerta testified at the ALJ hearing that she had difficulty with memory, and suffered from nausea and severe pain on a daily basis.  AR 66-69, 73.  She testified that her daily activities were limited, but she was able to do light chores around the house.  AR 70-71, 73.  She also testified that her medications made her drowsy, that she does not socialize, and that she no longer attends church.  AR 72-76.  Huerta said that although she has a driver's license, she had not driven in about eight months, or since November 2010.  AR 78.

The ALJ posed three hypothetical questions to the vocational expert.  For the first two questions, the ALJ asked whether an individual that has the capacity for light work or sedentary work but could not perform postural functions, foot controls, or reach overhead more than occasionally, cannot perform more than frequent handling and must avoid hazards would be able to perform any of Huerta's prior work experience.  AR 86-87.  The vocational expert responded that such a person could be an office manager, and possibly a receptionist.  *See id.*  For the third question, the ALJ asked about an individual with the same limitations and the capacity for sedentary work, but could not sit for more than 30 minutes without interruption and required a constant change in positions.  AR 87.  The vocational expert responded that there would be no jobs for a person with such limitations.  *Id.*

Dr. Huntley—the non-examining medical expert—recommended psychometric testing to determine the scope of Huerta's cognitive difficulties, and Dr. Tania Shertock, a psychologist, conducted a psychological evaluation in August 2011.  AR 919.  She noted that Huerta was unable to concentrate generally because of her severe pain, but acknowledged that an evaluation of Huerta's physical condition was beyond the scope of her exam.  AR 921.  She also noted that there

United States District Court
Northern District of California

United States District Court
Northern District of California

1   was no impairment in gait.  *Id.*  Dr. Shertock observed that Huerta's overall appearance and

2   demeanor were within normal limits, and opined that Huerta would be able to relate well in an

3   interview and appropriately interact with supervisors and coworkers in a job setting.  AR 919, 921.

4   However, she also opined that Huerta's severe pain would make it difficult to maintain a schedule

5   and adapt to work stress.  AR 921.

6          Dr. Shertock administered the Test of Memory and Malingering (TOMM), and the scores

7   indicated that Huerta did not put forth her best efforts and attempted to portray herself in a

8   negative light.  AR 920.  But she also administered the Rey's 15 Item Test to further test memory,

9   and the results were not characteristic of malingering.  *Id.*  Ultimately, Dr. Shertock diagnosed

10  Huerta with a pain disorder associated with a general medical condition and psychological factors,

11  generalized anxiety disorder, mood disorder due to a general medical condition, malingering

12  memory function, and a personality disorder not otherwise specified with histrionic features.  *Id.*

13  Dr. Shertock assigned a Global Assessment of Functioning ("GAF") score of 50, which indicates

14  serious symptoms.[4]  AR 921.

15  **III. THE ALJ'S DECISION**

16         The ALJ found that from the period of March 21, 2008 through May 31, 2009, Huerta's

17  Hodgkin's lymphoma, history of Hodgkin's lymphoma, peripheral neuropathy, and tenosynovitis

18  of the right wrist were severe impairments that affected her ability to perform basic work activities

19  during that period.  AR 113.  The ALJ also found that Huerta's joint pains and back conditions

20  were not severe, based on a lack of objective medical evidence.  *Id.*  The ALJ rejected Huerta's

21  claims that she had mental impairments (depression, anxiety, and cognitive difficulties, including

22  memory loss) that were severe.  After reviewing the evidence and the four functional areas

23  ("Paragraph B" criteria), the ALJ concluded that Huerta's mental impairments caused no more

24

25  [4] A GAF score is the clinician's judgment of the individual's overall level of functioning. It is

26  rated with respect only to psychological, social, and occupational functioning, without regard to
     impairments in functioning due to physical or environmental limitations. *See* American

27  Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 32 (4th
     Ed.2000).  A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe

28  obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
     school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

than "mild" limitations in her functioning and could not be considered severe.  AR 115-116.

Considering the severe impairments, the ALJ concluded that they did not meet or equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Turning to her RFC, the ALJ concluded that during this period Huerta had the RFC to perform sedentary work except that she could not sit for more than 30 minutes at a time and required a change of position for at least ten minutes before sitting again, and could not perform frequent handling or reach overhead more than occasionally, and was required to avoid hazards.  AR 117.  The ALJ then determined that Huerta was disabled during this period, because she could not perform any past relevant work as an office manager or receptionist, and there were no jobs in the national economy that existed in significant numbers that Huerta could have performed.  AR 118-19.  Huerta, therefore, was awarded benefits for March 21, 2008 through May 31, 2009.

The ALJ concluded that Huerta's period of disability ended on June 1, 2009, due to medical improvement.  AR 119.   The ALJ reasoned that although the objective medical evidence continued to support Huerta's initial impairments, there was "some improvement" in Huerta's peripheral neuropathy and her allegations of lumbar spine problems with radiculopathy and memory loss were not supported by the objective medical evidence.  AR 122.

The ALJ also found that Huerta's statements about the intensity, persistence, and limiting effects of her symptoms were not credible beginning June 1, 2009, "to the extent that they are inconsistent" with the ALJ's assessment of Huerta's RFC for the following reasons.  AR 122-23.  First, the ALJ reasoned that the record showed that Huerta's back problems were not as limiting as she alleged, considering that she was not seeking physical therapy (although she reported doing water aerobics on her own), and diagnostic testing showed only mild or subtle degenerative changes in her lumbar spine with no evidence of definitive nerve root impingement or displacement. AR 123 (citing AR 652, 687, 690, 890).  Second, she found that although the record corroborated Huerta's complains of feet numbness and loss of sensation, Dr. Novic's April 2010 nerve conduction studies showed normal nerve conduction for the left foot and improved sural sensory since his last diagnostic examination.  *Id.* (citing AR 685, 798).  The ALJ also pointed out that Dr. Dorosin noted that Huerta's subjective sensory loss was disproportionate to his

1  expectations.  *Id.* (citing AR 722).  Third, the ALJ considered Huerta's ongoing medication side

2  effects and symptoms of nausea, but noted that "on several occasions, she has refused offers by

3  treating specialists to change or try different medication in an effort to avoid side effects."  *Id.*

4      The ALJ concluded that the medical improvements increased Huerta's RFC, and that as of

5  June 1, 2009, Huerta could perform light work with some limitations—she cannot operate feet

6  controls more than occasionally, has postural limitations, cannot perform more than frequent

7  handling and is limited to overhead reaching only occasionally, and must avoid hazards.  AR 122.

8  In finding that Huerta's RFC had increased, the ALJ rejected or discounted the opinions of Drs.

9  Dorosin, Ware, Sandoval, Garren, Shertock, and Wu, but credited the non-examining opinions of

10  Drs. Huntley and Hartman.  AR 123, 125.

### A.  Dr. Dorosin

12      The ALJ accorded "no weight" to Dr. Dorosin's November 2010 and April 2009 opinions.

13  AR 124.  First, the ALJ reasoned that Dr. Dorosin's November 2010 opinion was not a truly

14  independent, medical opinion or professional judgment of Huerta's capacity because Dr. Dorosin

15  himself indicated that he completed the RFC form using Huerta's responses.  *Id.*  Therefore,

16  according to the ALJ, the November 2010 opinion was a reflection of Huerta's opinion of her own

17  capabilities, allegations, and subjective complaints—not Dr. Dorosin's.  *Id.*

18      Second, the ALJ accorded no weight to Dr. Dorosin's April 2009 "statement of disability

19  status" as an opinion of the ultimate issue of "disability" that is reserved to the Commissioner.

20  AR 124.  The ALJ also reasoned that Dr. Dorosin's April 2009 opinion "does not state a time

21  frame of application, temporary or permanent, or provide a functional evaluation that is useful in

22  evaluation of the claim."  *Id.*  The ALJ further reasoned that the April 2009 opinion is "clearly

23  inconsistent" with Dr. Dorosin's subsequent treatment notes involving clinical observations

24  through November 2010, Huerta's limited compliance with advised treatment, and diagnostic

25  testing showing improved nerve conduction results with minimal abnormality on other diagnostic

26  tests.  *Id.*

### B.  Dr. Sandoval

28      The ALJ accorded "little weight" to Dr. Sandoval's November 13, 2010 RFC opinion and

United States District Court
Northern District of California

15

her testimony during the June 2011 hearing.  AR 124.  First, she reasoned that Dr. Sandoval's opinion was based on Huerta's alleged symptoms and internally inconsistent, considering that Dr. Sandoval opined that Huerta's prognosis was "fair" despite her reported symptoms of back, leg, and feet pain, poor concentration, dizziness, and an inability to "walk at all" without rest or severe pain.  *Id.*  Second, she discounted Dr. Sandoval's opinion that Huerta had memory issues because Dr. Sandoval had not completed a mini-mental status exam and later testing revealed that Huerta was malingering with respect to memory.  *Id.*  Third, the ALJ found it significant that despite the totality of Huerta's complaints, no examining or treating physician—including Dr. Sandoval—had opined that Huerta was incapable of driving or reported her to the State authorities.  *Id.*  She also noted Huerta's testimony that she had a valid driver's license.  *Id.*

### C. Dr. Ware

The ALJ accorded "no weight" to Dr. Ware's February 2011 opinion as to Huerta's limitations reasoning that: (i) he saw Huerta only once or twice over three years despite Huerta's alleged back symptoms, and (ii) that his opinion was inconsistent with his own treatment notes and the other medical opinions.  AR 124.  More specifically, the ALJ reasoned that Dr. Ware characterized Huerta's back condition as mild in November 2010, and did not indicate that she needed a cane or other assistive device, yet in February 2011 he opined that she needed an assistive device and assigned several other exertional limitations.  *Id.*

### D. Dr. Shertock

The ALJ accorded "limited" weight to Dr. Shertock's August 2011 assessment of Huerta's functional capacity.  AR 125.  The ALJ discounted Dr. Shertock's statement that Huerta was in severe pain during the examination and suffered from chronic, severe pain that impacted Huerta's concentration, pace, and persistence.  *Id.*  The ALJ reasoned that such an evaluation was beyond Dr. Shertock's scope as a non-physician, and also noted that these complaints about the severity of Huerta's pain were recorded by Huerta's treating physician but not supported by objective medical evidence.  *Id.*  Finally, with respect to her conclusion that Huerta would be unable to maintain concentration, persistence or pace, the ALJ discounted that conclusion, reasoning that Dr. Shertock did not consider the testing results indicating that Huerta was malingering with respect to

United States District Court
Northern District of California

memory.  *Id.*

### E.  Dr. Garren

The ALJ found that Dr. Garren's April 2010 opinion with respect to Huerta's exertional limitations did not comport with the objective medical evidence, which showed that Huerta's back impairment was mild in nature.  AR 123.  In addition, the ALJ noted that Dr. Garren's diagnosis of neuropathy effectively mirrored the opinion of Dr. Dorosin.  *Id.*

### F.  Dr. Wu

The ALJ noted that Dr. Wu declined to complete a RFC assessment in that he did not list any symptoms or clinical or objective signs, but also noted that Huerta's prognosis was "good."  AR 123.

### G.  Dr. Hartman

The ALJ accorded "great weight" to the June 2009 opinion of Dr. Hartman, the non-examining medical consultant, that Huerta was capable of light exertion with limits because of her neuropathy, nausea, and dizziness.  AR 123.  Dr. Hartman also recommended other postural limitations, which would still allow plaintiff an RFC to work.  *Id.*

### H.  Dr. Huntley

The ALJ accorded "significant weight" to the opinion of Dr. Huntley, the medical expert who testified during the June 30, 2011 hearing, which was based on a review of nearly all of the medical evidence.  AR 125.[5]  With respect to the severity of Huerta's impairments, the ALJ relied on Dr. Huntley's statement that Huerta's positive Romberg test that showed that Huerta could be distracted indicated elaboration because it is impossible for such stabilization if there is an extreme lack of sensation.  *Id.*  The ALJ also relied on Dr. Huntley's opinion that Huerta's neuropathy was not as severe as Huerta alleges, considering there was no evidence in the record of "a medically prescribed four-legged cane or wheelchair."  *Id.*

After weighing the evidence, the ALJ concluded that Huerta was capable of performing past relevant work as an office manager and receptionist beginning June 1, 2009.  AR 126.  The

---

[5] Dr. Huntley did not review Exhibits 32F (AR 911-915) and 33F (AR 916-932) because this evidence was submitted after the hearing.  *See* AR 125.

United States District Court
Northern District of California

1    ALJ conceded that Huerta could not perform certain types of receptionist work, but found that a

2    person with Huerta's RFC could perform Huerta's past relevant work as an office manager as

3    Huerta actually performed it.  *Id.*

## LEGAL STANDARD

### I.  DISABILITY DETERMINATION

6            A claimant is "disabled" as defined by the Social Security Act if: (1) "he is unable to

7    engage in any substantial gainful activity by reason of any medically determinable physical or

8    mental impairment which can be expected to result in death or which has lasted or can be expected

9    to last for a continuous period of not less than twelve months," and (2) the impairment is "of such

10   severity that he is not only unable to do his previous work but cannot, considering his age,

11   education, and work experience, engage in any other kind of substantial gainful work which exists

12   in the national economy."  42 U.S.C. §§ 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159

13   (9th Cir. 2012).  To determine whether a claimant is disabled, an ALJ engages in a five-step

14   sequential analysis as required under 20 C.F.R. § 404.1520(a)(4)(i)-(v).

15           In the first two steps of the evaluation, the claimant must establish that he or she (1) is not

16   performing substantial gainful activity, and (2) is under a "severe" impairment.  *Id.* §

17   416.920(a)(4)(i)-(ii).  An impairment must have lasted or be expected to last 12 months in order to

18   be considered severe.  *Id.* § 416.909.  In the third step, the claimant must establish that his or her

19   impairment meets or medically equals a listed impairment described in the administrative

20   regulations.  *Id.* § 416.920(a)(4)(iii).  If the claimant's impairment does not meet or equal one of

21   the listed impairments, before proceeding to the fourth step, the ALJ is to make a residual

22   functional capacity determination based on all the evidence in the record; this determination is

23   used to evaluate the claimant's work capacity for steps four and five.  *Id.* § 416.920(e).  In step

24   four, the claimant must establish that his or her impairment prevents the claimant from performing

25   relevant work he or she did in the past.  *Id.* § 416.920(a)(4)(iv).  The claimant bears the burden to

26   prove steps one through four, as "[a]t all times, the burden is on the claimant to establish [his]

27   entitlement to disability insurance benefits."  *Id.* (alterations in original).  Once the claimant has

28   established this prima facie case, the burden shifts to the Commissioner to show at the fifth step

United States District Court
Northern District of California

18

1   that the claimant is able to do other work, and that there are a significant number of jobs in the

2   national economy that the claimant can do.  *Id.* §§ 416.920(a)(4)(v),(g); 416.960(c).

3   **II.  STANDARD OF REVIEW**

4              Under 42 U.S.C. § 405(g), a court reviews the ALJ's decision to determine whether the

5   ALJ's findings are supported by substantial evidence and free of legal error.  *Smolen v. Chater*, 80

6   F.3d 1273, 1279 (9th Cir.1996); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991) (ALJ's

7   disability determination must be supported by substantial evidence and based on the proper legal

8   standards).  Substantial evidence means "'more than a mere scintilla,' but less than a

9   preponderance."  *Saelee v. Chater*, 94 F.3d 520, 521-22 (9th Cir. 1996) (quoting *Richardson v.*

10  *Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence is "such relevant evidence as a

11  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401

12  (internal quotation marks and citation omitted).

13             A court must review the record as a whole and consider adverse as well as supporting

14  evidence.  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  Where evidence is

15  susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  *Morgan*

16  *v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).  "However, a reviewing

17  court must consider the entire record as a whole and may not affirm simply by isolating a 'specific

18  quantum of supporting evidence.'"  *Robbins*, 466 F.3d at 882 (quoting *Hammock v. Bowen*, 879

19  F.2d 498, 501 (9th Cir. 1989)); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

20                                              **DISCUSSION**

21             I must decide whether the ALJ erred in rejecting or discounting the opinions of Huerta's

22  treating and examining physicians, which are supported by the testimony of the lay witnesses, in

23  favor of the non-examining opinions of the medical consultant and medical expert.  As discussed

24  below, I find that the ALJ erred in rejecting the opinions of Dr. Dorosin and the opinions as to

25  functional capacity of Dr. Shertock, not considering the favorable testimony of medical examiner

26  Dr. Huntley, and relying on the dated RFC of non-examining consultant Dr. Hartman.  Because

27  these errors arguably infected the RFC determination, this matter must be remanded.

28

United States District Court
Northern District of California

19

1

2

3

## I.  LEGAL STANDARD FOR REJECTING OPINIONS OF TREATING AND EXAMINING PHYSICIANS

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Courts in the Ninth Circuit afford greater weight to a treating physician's opinion because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  However, the opinion of a treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability.  *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002).  If the medical evidence is conflicting, the Commissioner must determine credibility and resolve the conflict.  *Id.* at 956-57.  The ALJ must present clear and convincing reasons for rejecting the uncontroverted opinion of a disability claimant's physician, *Thomas*, 278 F.3d at 956, but may reject the opinion of a treating physician in favor of a conflicting opinion of an examining physician if he or she makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Magallanes*, 881 F.2d at 751. Finally, "an ALJ may reject the testimony of an examining, but non-treating physician, in favor of a nonexamining, nontreating physician when he gives specific, legitimate reasons for doing so, and those reasons are supported by substantial record evidence." *Lester*, 81 F.3d at 831 (citations and emphasis omitted).

## II.  DR. DOROSIN

Huerta argues that the ALJ did not have legitimate reasons for discounting Dr. Dorosin's April 2009 disability determination and his November 2010 RFC opinion.  Pl.'s Mot. 19-20.  The ALJ discounted Dr. Dorosin's November 2010 RFC opinion because Dr. Dorosin's treatment notes indicated that the main purpose of Huerta's visit was to fill out the RFC form and that he "filled out the form specifically using her responses." AR 685; AR 123-24.  However, even though the RFC form as to Huerta's limitations may be based on Huerta's own responses, there

20

are statements within that RFC form from Dr. Dorosin himself, including Dorosin's conclusion

that Huerta suffered from chronic neuropathy, his own opinion that Huerta's impairments were

reasonably consistent with the symptoms and functions described in the evaluation, and Dr.

Dorosin's own statement that "I don't think she can work." AR 673-74.  It is true that "[a]

physician's opinion of disability premised to a large extent upon the claimant's own accounts of

his symptoms and limitations may be disregarded where those complaints have been properly

discounted." *Morgan*, 169 F.3d at 602; *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d

1190, 1195 (9th Cir. 2004) (holding that ALJ did not err in according minimal weight to treating

physician's opinion where the opinion on claimant's "inability to work was based solely on his

subjective complaints").   Here, however, the ALJ failed to recognize and address the significant

portions of the RFC analysis that were Dr. Dorosin's own opinions and she failed to determine

whether the functional limitations included with the RFC were, in fact, inconsistent or

unsupported by Dr. Dorosin's own opinion, his treatment notes, or other parts of the record.  This

was error.

The ALJ discounted Dr. Dorosin's April 2009 opinion that Huerta was "disabled," because

that went to the ultimate issue of disability to be determined by the ALJ.  The ALJ, however,

failed to address Dr. Dorosin's opinion (reflected in his contemporaneous treatment notes) as to

*why* he believed Huerta was disabled.  If there was ambiguity as to the basis of his conclusion, the

ALJ should have sought clarification from Dr. Dorosin as to the basis of his conclusion that

Huerta was disabled, as required by Social Security Ruling 96-5p.[6]  Pl.'s Mot. 20; *see also Bayliss

v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (an ALJ is required to recontact a doctor if the

doctor's report is ambiguous or insufficient to make a disability determination, unless the ALJ can

use the whole record to make a disability determination).

The ALJ also discounted the 2009 opinion that Huerta was disabled, because it is "clearly

---

[6] SSR 96-5p provides "adjudicators must always carefully consider medical source opinions
about any issue, including opinions about issues that are reserved to the Commissioner. For
treating sources, the rules also require that we make every reasonable effort to recontact such
sources for clarification when they provide opinions on issues reserved to the Commissioner and
the bases for such opinions are not clear to us."

United States District Court
Northern District of California

1   inconsistent with Dr. Dorosin's subsequent treatment notes involving clinical observations through

2   November 2010" as well as plaintiff's limited compliance with treatment advice, and Dr. Novic's

3   diagnostic testing showing improved nerve conduction as well as minimal abnormalities on other

4   diagnostic tests.  The ALJ does not clearly identify the evidence she relied on with respect to the

5   "clinical observations" and plaintiff's failure to comply with treatment advice.  If she was relying

6   on Huerta's reluctance to try different medicines for her neuropathy, Huerta had a clear reason

7   which was supported by Dr. Dorosin; her concern that the other medications would further impair

8   her cognitive abilities.  More importantly, there is no evidence in the record that the other

9   medicines suggested by Dorosin would have significantly reduced Huerta's neuropathy pain.

10  With respect to his "clinical observations" Dr. Dorosin consistently identified Huerta with painful

11  and limiting neuropathy, and never indicated that the pain she reported was the result of

12  malingering.  At most, Dr. Dorosin noted that Huerta's physical signs of sensory loss seemed

13  "disproportionate" to his expectations.   AR 722.

14          Finally, Dr. Dorosin noted that while Dr. Novic's diagnostic testing (relied on by ALJ)

15  "showed some improvement," neither Novic nor Dorosin concluded that Huerta was not still

16  suffering from neuropathy.  *Id.*[7]  And while her physical signs of sensory loss "seem

17  disproportionate" to his expectations, that does "not necessarily mean that the patient's

18  impairment is embellished."  *Id.*

19          I find, therefore, that the ALJ erred in discounting Dr. Dorosin's 2009 and 2010

20  conclusions as to Huerta's disabilities and RFC capacity without specific and legitimate reasons

21  for doing so based on substantial evidence in the record.

22  **III.  DR. SHERTOCK**

23          Huerta also challenges the ALJ's discounting of Dr. Shertock's opinion that Huerta's

24

25  _____

26  [7]  Dr. Novic, in his June 2011 consultation notes expressed concern that Huerta might be
    "elaborating" responses on examination and that she did not give full effort on her neurologic
    examination, he also noted that Huerta continued to have absent reflexes and joint position sense

27  in her feet and ankles and diminished sensation below the knees.  AR 912-13.  He also recognized
    that while none of her complaints (about burning pain in the feet, memory disturbance and low

28  back pain) had objective correlates on testing/examination, they "would all be very diffcult to
    confirm objectively this way."  AR 913.

1    severe pain interfered with her ability to maintain concentration, persistence, and pace.[8]  The ALJ

2    discounted Dr. Shertock's opinion as to Huerta's capacity because (i) Dr. Shertock's discussion of

3    Huerta's pain was beyond the scope of her  psychological examination and based on Huerta's

4    subjective complaints of pain that were not supported by objective medical evidence; and (ii) Dr.

5    Shertock did not consider the testing results showing malingering in formulating her opinion .  AR

6    125.

7            With respect to the scope of Dr. Shertock's evaluation, her conclusion that Huerta's pain

8    (subjective or not) was severe enough to interfere with her concentration, persistence, and pace

9    was directly within the scope of her psychological evaluation which determined that Huerta has a

10   pain disorder associated with a general medical condition and psychological factors.  AR 920.

11   With respect to malingering, in formulating her opinion, Dr. Shertock was clear that the results of

12   the TOMM were indicative of malingering as to memory.  *Id*.  Dr. Shertock, however, also noted

13   that another test, the Rey's 15 Item Test, was not indicative of malingering.  *Id*.   There is no

14   indication – contrary to the ALJ's suggestion – that Dr. Shertock failed to consider the potential of

15   malingering with respect to *memory* on her ultimate conclusion that Huerta's "chonic severe pain"

16   interfered with her ability to maintain, concentration, persistence and pace.  Moreover, while

17   placing significant weight on the TOMM results, the ALJ herself fails to address or recognize the

18   results from the Rey's 15 test, which were not indicative of malingering.  Therefore, I find that the

19   ALJ did not provide legitimate reasons supported by substantial evidence for discounting Dr.

20   Shertock's opinion as to Huerta's capacity.

21   **IV. DR. HUNTLEY**

22           Huerta argues that the ALJ's summary of Dr. Huntley's testimony was "woefully

23   incomplete" and that the ALJ ignored testimony from Huntley that supported Huerta's position

24

25   ────────────────────────
     [8] Huerta does not argue that the ALJ erred in applying the four-part "Paragraph B" criteria for
26   determining whether Huerta was disabled by virtue of a mental impairment.  *See* AR 115-16.
     Instead, Huerta argues that the ALJ erred in not accepting Dr. Shertock's statements about
27   Huerta's functional capacity—namely that Huerta's physical pain affected her ability to maintain
     concentration, persistence, and pace.  I also note that, contrary to Huerta's assertion that the ALJ
28   failed to mention Dr. Shertock's GAF of 50 (Pl.'s Mot. 24 n.3), the ALJ discussed Dr. Shertock's
     GAF assessment in her discussion of Huerta's mental impairments.  *See* AR 115.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   that she was disabled after June 2009.  Pl.'s Mot. 25-26.  The ALJ, for example, failed to discuss

2   Dr. Huntley's testimony that Huerta could only walk for 15 minutes and his testimony that Huerta

3   might not be able to sit for more than 30 minutes.  AR 43-44.  The ALJ also ignored that Dr.

4   Huntley agreed with Dr. Dorosin that Huerta would need to take about 12 breaks in an eight-hour

5   workday.  AR 46.  The failure to discuss these portions of Dr. Huntley's testimony was error.  *See*

6   *Magallanes*, 881 F.2d at 753 ("To the extent that [a doctor's] testimony was equivocal or even

7   supported [claimant's] position, it was the responsibility of the ALJ to consider it along with other

8   conflicting evidence and opinion testimony in reaching his conclusion.  It is not necessary to agree

9   with everything an expert witness says in order to hold that his testimony contains substantial

10  evidence." (citation and internal quotation marks omitted)).

11          Instead, ALJ cited portions of Dr. Huntley's testimony that supported her conclusion that

12  Huerta was not disabled as of June 1, 2009, including Huntley's questioning the severity of

13  Huerta's neuropathy as there was no evidence that Huerta had a medically prescribed four-legged

14  cane or wheelchair.  AR 125.  However, the fact that Huerta had not been prescribed a medically

15  prescribed cane or wheelchair does not undermine the functional limitations that Huerta did have,

16  according to Huntley's own testimony.

17          The ALJ also gave "significant weight" as part of her RFC determination to Huntley's

18  questioning of Huerta's cognitive difficulties and his recommendation for psychometric testing.

19  AR 125.  However, the psychometric testing was subsequently secured yet the ALJ does not

20  explain how it supported or detracted from Huntley's concerns.  The ALJ also relied on the fact

21  that Huntley determined Huerta's impairments failed to meet a listing.  *Id.*  But the issue being

22  discussed at that point in her opinion was not the listings, but Huerta's RFC.   Therefore, the

23  ALJ's reliance on these portions of Huntley's testimony to support her RFC determination was

24  likewise erroneous.[9]

25          Because the ALJ relied on portions of Huntley's testimony that were not relevant to the

26

27  _____

28  [9] The ALJ also relied on Huntley's testimony that because Huerta's was not receiving treatment for her alleged tinnitus, the tinnitus could not support a functional limitation.  Huerta's does not contend, on appeal, that her tinnitus affected her RFC or otherwise contributed to her disability.

RFC determination and failed take into account portions that were relevant and favorable to

Huerta, the ALJ committed legal error. *See*, *e.g. LaPierre v. Callahan*, 982 F. Supp. 789, 794

(W.D. Wash. 1997) (holding that the ALJ erred by failing to "sufficiently consider evidence in

plaintiff's favor and placed undue weight on the opinion of the non-examining physician"); *see*

*also Magallanes*, 881 F.2d at 753.

## V.  DR. HARTMAN

Having rejected the RFC's of each of Huerta's treating physicians as well as the capacity

opinions of Dr. Shertock and the limitations as to capacity indicated by Dr. Huntley, there was

only one other RFC in the record; the June 24, 2009 RFC by non-examining consultant Dr.

Hartman.  The ALJ gave "great weight" to Dr. Hartman's opinion as to Huerta's capacities and

limitations.  AR 123.  Dr. Hartman, however, issued his RFC in June 2009 – almost two and a half

years before the ALJ's decision issued.  Huerta argues that Dr. Hartman's opinion is of little value

and the more recent opinions in 2010 and 2011 as to her capacity are of the greatest value because

her condition began deteriorating in 2008 and continued to deteriorate.  *See* Pl.'s Mot. 25; *see also*

*Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001) ("A treating physician's most recent

medical reports are highly probative."); *Stone v. Heckler*, 761 F.2d 530, 532 (9th Cir. 1985)

("Because [claimant's] condition was progressively deteriorating, the most recent medical report is

the most probative.  Earlier medical evaluations, based on [claimant's] condition several months

before, do not constitute substantial evidence to rebut the conclusions contained in" treating

physician's most recent report).

More problematic, however, is that the ALJ herself determined that Huerta was disabled

through May 31, 2009.  Yet, the ALJ relied on Hartman's June 24, 2009 RFC (which was based

on Huerta's medical records through May 2009), to find her *not* limited enough to be disabled as

of June 1, 2009.  The ALJ failed to explain what she found in Hartman's review or RFC to support

her own changed position as to Huerta's functional capacity as of June 1, 2009. Because the ALJ

does not explain why she rejected Dr. Hartman's opinion from the period of March 21, 2008

through May 31, 2009, but accepted Dr. Hartman's opinion thereafter, the ALJ's reliance on Dr.

25

Hartman was error.[10]

In sum, the ALJ improperly discounted the opinions of Huerta's treating physician, as well as the opinion of an examining consultant and the favorable testimony of the medical examiner. Instead, the ALJ relied strongly on a stale RFC from a non-examining consultant that itself contradicted the ALJ's own determination as to Huerta's RFC through May 31, 2009.  These errors impacted the RFC determination and require remand.

Huerta also argues that the ALJ erred in: (i) discounting Dr. Ware's February 2011 RFC; (ii) discounting Dr. Sandoval's November 13, 2010 RFC as well as her testimony during the hearing; (iii) discounting Dr. Garren's April 2010 opinion as to capacity; and (iv) the ALJ's out of context reliance on Dr. Wu's opinion that Huerta's prognosis was "good," when Dr. Wu's prognosis, as Huerta's oncologist, was limited her lymphoma.   These doctors provided consistent evidence supporting Huerta's symptoms and limitations, as did Huerta herself and the lay witnesses.  They provide further proof, although none is needed, that remand is necessary in this case.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED and plaintiff's motion GRANTED.  This matter is remanded for further consideration consistent with this opinion.

**IT IS SO ORDERED**.

Dated: May 8, 2014

_____
WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California

---

[10] Huerta argues that Dr. Hartman's opinion is of little value because he evaluated her RFC without reviewing any "treating source opinions."  *See* Pl.'s Mot. 25.  However, the record indicates that Dr. Hartman reviewed a report from Dr. Dorosin, as well as several other reports from 2008 and 2009.  *See* AR 599-601.